Judge Hitchcock
delivered the opinion of the court:
In considering this case we are first to inquire whether the replications to the special pleas in bar are in law a sufficient answer to those pleas ; and, in order to settle this question, it is necessary to ascertain the substance of those pleas. Stripped of their verbiage, they contain the charge that Paddleford, being in want of money, applied to the plaintiffs for a loan, and that an unlawful, usurious, and corrupt agreement was entered into between the plaintiffs and Paddleford, whereby they undertook to furnish him with the money by discounting a bill of exchange at and for a greater rate of interest or discount than six per cent, per annum, in pursuance of which unlawful agreement the money was furnished, and the bill in controversy was discounted at a greater rate of interest than six per cent, per annum, which conduct of the plaintiffs, it is claimed, is in contravention of the general law of the land, and of their special law of incorporation.
In answering these pleas the plaintiffs neither admit nor deny this agreement, or that it was carried into effect. They neither traverse the matters set out, nor do they confess and avoid. They merely assert that the bill of exchange was drawn “for a good and legal consideration, and not in pursuance of, or upon the said ♦unlawful, corrupt, and usurious agreement, nor for the *282 purposes ” in the first and following pleas alleged. This, so far, is no answer to the pleas. There is no allegation in the pleas that the bill was not drawn for a good and legal consideration, or that it was drawn in pursuance of any unlawful or corrupt agreement. The charge is, that after the bill was drawn, a “ corrupt ’’ agreement was entered into for its discount, and this is neither confessed nor denied by the replication. The replications next aver that the plaintiffs “purchased the bill of exchange from the said drawers (or a good and valuable consideration, to wit, for,’’ etc., and close, by tendering an issue to the country. There can be no doubt that each of the replications present a variety of points, and is multifarious. Each attempts to put in issue matters which are immaterial. The matter introduced into each is new, and, of course, they should have concluded with a verification. Two replications, too, are in effect put into each plea, which is not allowable. For these reasons, as well as for others which might be stated, we hold the replications to be defective in point of form, and bad in special demurrer.
The plaintiffs do not seem, however, to have placed much reliance upon their replications, as they have scarce made an effort to sustain them. The great question in the case is, whether the facts set forth in the pleas constitute a defense to the action. This question has been argued by the counsel with much earnestness and with great ingenuity. It is one of much importance, and is certainly not without its'difficulties. We have examined it with care, and have been enabled to come to a conclusion without any difference of opinion.
The facts set forth in the plea show that the consideration passing from the plaintiffs, a banking company, for this bill of exchange, was a loan of money, and that this loan was effected at a rate of interest greater than six per cent, per annum. It can make no difference that the contract, received by the plaintiffs to secure the payment of this money, is a bill of exchange, and not a promissory note. If, under the circumstances of this case, a promissory note would be void, then this bill of exchange must be void.
It is contended by defendants’ counsel that this contract is void, etc., being contrary to and against the statute law of the state regulating interest, and many authorities have been cited to sustain this position. Our statute regulating interest provides “that *283 all creditors shall be entitled to interest on all money after the same *shall become due, either on bond, bill, or promissory note, or other instrument of writing, or contract for money or property, on all balances due on settlement between the parties thereto, or money withheld by unreasonable and vexatious delay of payment, and on all judgments obtained from the date thereof, and upon all decrees obtained in any court of chancery for the payment of money, from the date specified in the said decree for the payment thereof; or if no delay be specified, then from the day of the entering thereof, until such debt, money, or property is paid, at the rate of six per cent, per annum, and no more. 29 Ohio L. 451. This law fixes the rate of interest, but it does not affix a penalty if any person shall receive more than the rate thus fixed. It does not declare a contract for the payment of a greater rate void, although it does, to my apprehension, prohibit the taking of a greater rate. The authorities cited, some of them at least, show that in cases where statutes against usury do not annex any penalty, or do not declare usurious contracts void, courts have declared them void as against positive law.
We agree with counsel that contracts made.against good morals, against public policy, and against positive law, are, as a general rule, void; and it is possible that if there had been no statute in Ohio previous to the one before recited, and we were now called upon for the first time to give that statute a construction, we might say that a contract reserving more than six per cent, interest on the principal sum loaned was void, as being contrary to that statute. But this is not the first time this question has been before the court, and if the construction of any one of our statutes can be considered as settled by judicial decision and practice it is this. 7 Ohio, 83. We have hold that a contract reserving interest at the rate of more than six per cent, per annum is not void, but that upon such contract a plaintiff may recover the principal sum, together with six per cent, interest. As, however, counsel seem so confident that this principle is not in accordance with the general rules of law, it may be well to look back and see what has been the course of legislation in the state upon this subject, and inquire whether the practice of the courts has been such as to carry into effect the legislative intention.
The first law upon this subject, within the territory now constituting the State of Ohio, was enacted by the territorial legis *284 lature, and approved November 15, 1799. I say this was the first law upon the subject of interest. True, a law was published by the ^governor and judges on July 14, 1795, declaring the common law of England, and all English statutes in aid of the common law, passed prior to the fourth year of the reign of James I, to be in force in the territory. 1 Chase’s Ohio L. 190. And if this law was adopted in conformity with the authority of the tribunal publishing it, then the English statutes upon the subject of interest and usury were in force here from 1795 to 1799. By the ordinance of 1787, the governor and judges of the Noi’thwestern Territory were authorized to adopt and publish “such laws of the original states” as might be necessary for the well-being of the territory. Beyond this their legislative power did not extend. 1 Chase’s Ohio L. 67. And it might be difficult to maintain that under this authority they would have a right to adopt the English statutes in bulk, because those statutes had thus been adopted in one of the original states. The law of July 14,1799, before referred to, was adopted from Virginia. 1 Chase’s Ohio L. 190. This, however, is a question of mere curiosity, and can be of no practical importance at this late period.
The territorial act of November 15, 1799, “regulating the interest of money,” etc., fixed the rate of interest at six per cent. But it inflicted no penalty for reserving or taking a greater rate; it did not declare any contract made with that view void, nor did it create any forfeiture of the principal sum. The only forfeiture-incurred under that act was the forfeiture of the entire interest. It was expressly provided that the lender might recover the principal sum loaned, after deducting whatever • payments had been made by way interest. 1 Chase’s Ohio L. 217. This statute recognized the principle that a contract might be “ good in part and void in part.” The provisions of this statute, it is believed, were novel, and they are certainly entirely at variance with the provisions of the English statutes, and with the provisions of the pre-existing statutes of the “ original states ” upon the same subject. This difference may be accounted for in the change of opinion upon the propriety of the prohibition of usury. At tho time of the enactment of the statute of Henry VIII, and of the other English statutes, to demand or to receive usury (and all interest was considered usury), was deemed to be highly immoral, if not a deadly sin. Most of the statutes of the or'ginal states *285 were copied from these English statutes, and enacted under the same state of feeling. This state of feeling, too, unquestionably influenced the courts in giving construction to those statutes. But in 1799, as well as since that period, it was and has been a mere question of *poliey whether interest should be regulated by law, and to what extent. ■
This law of 1799 continued in force until December 29, 1804, when it was repealed by another act upon the same subject. This act of 1804 fixes the rate of interest at six per cent, per annum, and provides, that if any person shall demand or receive more than at this rate, “such person shall forfeit the whole amount of the debt on which such illegal interest was charged or received,” the one-half to be paid into the county treasury, and the other half to the informer or the person pi’osecuting. This statute is substantially, if not literally, the same with that of Pennsylvania upon the same subject, and was probably copied from the laws of that state. In the case of Wycoff v. Langbrad, 2 Dallas, 92, decided in 1785, which was an action on a promissory note, to which the defendants pleaded the act of assembly against usury, the Supreme Court of that state held, “that when more than legal interest was included in any note, bond, or specialty, the whole amount could not be sued for and recovered; but the plaintiff was entitled, in such case, to a verdict for the just principal and lawful interest.” The same doctrine is held in a more modern case (12 Serg. & Rawle, 46), and this is considered as a settled rule in Pennsylvania.
Is it strange that when the legislature of Ohio passed a law substantially the same with that of Pennsylvania, that the courts of Ohio should put upon that law the same construction which had been put upon it by the courts of Pennsylvania? It would have been strange if they had done otherwise. Especially when it is remembered that at that early period a great plurality, if not majority,- of the citizens of Ohio, were emigrants from Pennsylvania, and had more frequent and easy intercourse with that state than with any other in the Union.
The courts of this state did put the same construction upon the statute of Ohio, and it is believed there was not, while the act of 1804 continued in force, a single case in which a contract for the payment of more than six per cent, interest was held to be void. On the contrary, in such cases, a plaintiff was allowed to recover *286 “the just principal and lawful interest.” If this was contrary to the legislative intentions, would not the law have been changed ? It was in reference to this course of practice that the court say in Smith v. Parsons, 1 Ohio, 239, in speaking of laws against usury, “should such a law enact, that a lender may receive from a borrower six per cent, interest and no more, and should an after-^contract contain an express promise to pay ten per cent., such a contract, although voluntarily made for the payment of a specific sum of the contract, would be entirely destroyed, and the obligor released from the payment of both principal and interest.
This law of 1804 continued in force twenty years, and was then repealed by the act of January 24, 1824, which has been already recited and which continues still in.force. The act of 1824 is the same with that of 1804, with the exception of the clause of forfeiture. And it would have been strange indeed, if a court which held an usurious contract to be only void in part, under the law of 1804, which contemplated a forfeiture, should hold the whole contract void under the law of 1824, under which there can be no forfeiture. In truth, until the present case arose, the only controversy about the law of 1824 has been, whether it contained any prohibition of usury at all, it being insisted by many that it was only intended to fix the rate of interest where the parties to a contract had not themselves fixed it; and that parties might contract for the payment of any rate of interest they might think proper, which contract would be enforced in the judicial tribunals of the country. This was not the construction put upon the law immediately after its enactment; but the same practice was adopted under it, so far as the parties to a contract were concerned, as under the law of 1804. And such has been in this court, with but little variation, the uniform practice under it until the present time. 7 Ohio, 83*
From the foregoing remarks, it will be seen that from 1804 to the present period, there has been no time in which an individual might not recover the principal sum of money loaned, together with lawful interest, notwithstanding by the terms of the loan he was to have received a greater rate of interest.
But we are now urged to review former decisions, and to give such a construction to the interest law as will make all existing contracts, as well as all that may hereafter be entered into, for the payment of more than six per cent, interest, void. And what reason *287 is urged why this should be done? Not that any injustice is done by the law as hitherto understood and construed, for it has been admitted in argument that the borrower of money at a usurious interest, although at law he might avoid the payment of the whole, yet in conscience would he be bound to repay the principal sum with lawful interest. Our law, then, only compels a man to perform that which, in conscience, he is bound to do. And of *a construction which produces no other effect than this, there certainly ought to be no complaint.
It is argued, however, that upon similar laws the courts of Great Britain and of some of our sister states have decided differently. And it is supposed that those courts would have decided differently upon our own statute. It may be, and probably is so. I would at all times pay great deference to the decisions of the courts of England and of our sister states, but I would not change the construction of a statute which has prevailed for almost forty years, and which operates justly, because originally^a different construction might have been put upon the same statute by a court of some other country. I would not do it even if I believed the original construction to have been wrong; for it would be far better to adhere to a construction thus long persevered in, and which confessedly contributed to abstract justice, but which was technically incorrect, than to make a change after so great a lapse of years. The statute regulating the rate of interest as construed by this court is now well understood. Contracts may have been made with reference to that construction, and which, according to that construction, are valid in part, if not in whole. Adopt the construction contended for by the defendants’ counsel, and the validity of these contracts would be impaired. Not, it is true, by a legislative enactment; that oould not be done (it is prohibited by the constitution), but by a judicial decision of this court, reversing the whole current of its previous decisions upon the same subject for more than thirty years. If there he anything wrong in the law, it is within the legitimate province of the legislature to correct the evil; not, it is true, so far as subsisting contracts are concerned, but so far as contracts hereafter may be made.
Upon the whole, we entertain the opinion that the contract in the ease under consideration is not void as being against the general law of the state upon the subject of interest.
The next and more important question is, whether this contract *288 is void as having been made in violation of the act incorporating the Bank of Chilticothe. That clause in the charter which is supposed to have been violated is in section 20 of the act, and in the following words : “ The said corporation shall not take more than at the rate of six per centum per annum on its loans or discounts.” 3 Chase’s Ohio L. 20, 29. It will be observed that the language here used is substantially the same with that used in the statute regulating interest. By this latter act, all creditors are entitled to interest, “ at the rate of six per cent, per annum, and no *more;” while in the act of incorporation, the phraseology is, “The said corporation shall not take more than at the rate of six per centum per annum,” etc. And it is insisted by the plaintiffs’ counsel, that inasmuch as this court-hold that a contract between individuals, for the payment of more than this rate of interest, is only void as to the excess over and above six per cent., that the same rule shall be applied in the construction of similar contracts made by this corporation. There is certainly much plausibility and no little force in the argument. But there is another question involved in construing a contract made by a coqmration^ and that is the question of capacity of the corporation to make such contracts. There is a great difference between natural persons and corporations. Natural persons have capacity and power to make and enter into any contracts which are not prohibited by law, and will be bound by such contracts. In the absence of any law upon the subject of interest, such persons might legally make contracts for the payment of ten, fifteen, or twenty per cent, interest for the use of money, and at law such contracts must be enforced. Nor would there be any more impropriety in the conduct of a man who should demand an extravagant rate of interest, than in the conduct of him who should demand an extravagant price for his goods and chattels. He might be guilty of a violation of the laws of conscience in taking advantage of the necessities of his neighbor, but would not be guilty of a violation of the laws of the land. True, if the terms of a contract were such as to shock the feelings, a court of equity might relieve against it, but at law it would be obligatory. Still, although such are the principles which preváil with respect to natural persons, the contracts of infants and femes covert ave not in general binding upon them, but are void or voidable. There is a particular class of contracts, however, by which even infants will be bound, and-these are con *289 tracts for necessaries. Such are the general rules of law relative to the contracts of natural persons.
But it is otherwise with corporations. A corporation is a body created,by law, composed of individuals united under a common name, and having. succession while it shall exist. It is the creature of the law, and derives all its powers and capacities from the law of its creation. “ The modern doctrine is, to consider corporations as having such powers as are specifically granted by the act of incorporation, or as are necessary for the purpose of carrying into effect the powers expressly granted, and as not having any other. 2 Kent’s Com. 298; 2 East; 2 Cranch, *127; 4 Wheat. 636; 4 Pet. 152; 15 Johns. 358; 5 Conn. 560; 3 Pick. 232.
As a corporation is created by law, it is proper that in all cases where it attempts to act, it should show, by its charter of creation, it has power so to act. Eor a corporation, created for the purposes of constructing a railroad, or of acting as a library association, to carry on banking operations, and to claim to do it under its charter, would be absurd, unless the power so to do was expressly or by implication authorized in its charter. If an agent is restricted by the power received from his principal, if the legislature of the state can not transcend the powers delegated in the constitution, much less can a corporation go beyond the charter by which it exists. There is great propriety in holding corporations to the strictness of the law by which they were created when it is considered that a charter granted to a private company is in the nature of a contract, and can not subsequently be revoked by the power which granted it without a violation of the constitution of the United States, which is the supreme law of the land.
The president, directors, and company of the Bank of Chillieothe, plaintiffs in this suit, were incorporated February 18, 1808; and, by their act of incorporation, they are “ made able and capable, in law, to have, receive, purchase, enjoy, and retain to them and their successors, lands, tenements, hereditaments, goods, chattels,'and effects of what kind, nature, or quality soever, and the same to sell, demise, grant, alien, or dispose of;.to sue and be sued,” etc., and generally to do all acts it may to them appertain-to do, subject nevertheless to the restrictions and limitations in the act subsequently prescribed and declared.” 3 Chase’s Ohio-Ii. 20, 27. In section 15 of the act, it is declared “ that the lands,. *290 tenements, and hereditaments, which it shall be lawful for said corporation to hold, shall be only such as shall be requisite for its accommodation in relation to the convenient transaction of its business; or such as shall have been bona fide mortgaged to it by way of security, or conveyed to it in satisfaction of debts previously contracted in the course of its dealings; or purchased at sales upon judgments which shall have been obtained for such debts; and the said corporation shall not, directly or indirectly, deal ór trade in buying or selling any goods, wares, or merchandise or commodities whatever, except in selling the same when truly pledged to it by way of security for any debt due the said ■corporation; or purchasing the same at sales on judgments which ■shall have been obtained for any debts previously contracted in *the course of its dealings.” And section 20 is as follows: “ That the said corporation shall not take more than at the rate of six per centum per annum on its loans or discounts.” The continuance of this corporation is limited to January 1,1818, but was ¡afterward extended to January 1, 1843, by the “act to incorporate «certain banks therein named, and to extend the charters of existing incorporated banks,” passed February 23, 1816. 2 Chase’s 'Ohio L. 913. And, by this latter law, this bank, with others, was ¡authorized to take interest at the rate of six per centum per annum, dn advance, upon its loans and discounts, and no more.
Taking this law in its several parts, it empowers this corporation to carry on banking operations, and to “do all acts it may ¡appertain to them to do ” as a banking company within the restrictions prescribed.
It has power to hold land, but it shall be only such and so much ,as is necessary for its accommodation, relative to the convenient ■transaction of its business; or such as may have been mortgaged ■to it to secure, or conveyed to it in satisfaction of a debt, or such ¡as shall have been purchased at sales upon judgments obtained for 'its debts.
It has power to deal in goods; but it is only in soiling such ¡as have been truly pledged to it in security for any debt due, or ■purchasing the same at sales on judgments which shall have been obtained for debts previously contracted in the course of ¡its dealings.
It has power to loan money or to discount bills or notes; but it <can only be done at a rate of interest at or under six per centum *291 per annum, in advance. Beyond this, it has no more power or capacity to go, than it has to. engage in any commercial or manufacturing transaction.
Suppose this corporation should enter into a contract for the purchase of a tract of land, not for its convenience — not for the payment of a debt to it due, but for the purposes of speculation, could it enforce such a contract? A natural person might enforce a similar contract, but this corporation could not, for the simple reason that for the purposes of such a contract it has no existence. It has no power, no capacity.
The same would be the case with respect to a contract relative to goods, not within the terms of its charter.
If it be true that contracts authorized by the charter relative to lands or goods are void, upon what principle shall we apply a different rule as to money contracts? This corporation has power *to loan money, provided it loans it at a rate of interest not exceeding six per cent, interest per annum; but it has no power or capacity to loan money at a rate above and beyond this. And if a contract, as before stated, relative to lands or goods would be void, certainly the unauthorized, the forbidden contract with respect to money must be. That such a contract is void, is fully sustained by the opinion of the Supreme Court of the United States in the case of the Bank of the United States v. Owens and others, 2 Pet. 527.
The pleadings in the case before the court show that here WaS' a loan of money, and a contract for the repayment of the principal sum with interest, at a' greater rate than that authorized by the plaintiffs’ act of incorporation. This loan was effected by the discount of the bill of exchange now in suit. This contract is void, not because the rate of interest is greater than the rate allowed by the general law of the land, but because it is such a contract as the plaintiffs had no capacity or power to make.
In the present state of pleadings, the plaintiffs have no title to recover, but on their motion, leave is given them to amend.